Virginia CLOUD, Executrix of the Estate of Marion Isbell, Deceased
*v.* Amber BRANDT, Executrix of the Estate of Marie Isbell,
Deceased; and William Holden

06-1102                                                              259 S.W.3d 439

Supreme Court of Arkansas
Opinion delivered June 21, 2007

[Rehearing denied September 6, 2007.]

*Gibson Law Office*, by: *Chuck Gibson*, for appellant.

*Daggett, Donovan, Perry & Flowers, PLLC*, by: *Jim Pat Flowers*, for appellees/cross-appellants.

ANNABELLE CLINTON IMBER, Justice. The instant case involves a dispute over the title and distribution of certain property claimed by the estate of the decedent, Marion Isbell. The Lonoke County Circuit Court determined that several certificates of deposit (CDs) purchased by Marion in his own name with funds from a joint checking account were owned by Marion and his wife Marie as tenants by the entirety; the CDs, therefore, belonged to Marie by operation of law as the surviving tenant. Virginia Cloud, the executrix of Marion's estate brings the instant appeal and alleges two points of error: (1) Marie Isbell's request for a declaratory judgment that she had title to the CDs was time barred under the nonclaim statute, Ark. Code Ann. § 28-50-101(a) (Repl. 2004), and (2) the circuit court erroneously relied on a decision by the Arkansas Court of Appeals in *Lofton v. Lofton*, 23 Ark. App. 203, 745 S.W.2d 635 (1988), to conclude that Marie Isbell was entitled to the CDs as the surviving tenant by the entirety.

Amber Brandt, the executrix of Marie Isbell's estate,[1] brings a cross appeal, alleging that the circuit court erred in not concluding that all of the personal property claimed by Marion's estate was owned by Marion and Marie as tenants by the entirety. William Holden, Marie's son, also brings a cross appeal arguing that the circuit court erred in denying his $20,000 claim against Marion's estate. We have jurisdiction over the instant appeal pursuant to Ark. Sup. Ct. R. 1-2(b)(2) & (5) (2007) because it involves a perceived inconsistency between the court of appeals's decision in *Lofton* and the decisions of this court and a need for the clarification or development of the law.

Marion and Marie married in 1932. She brought one child to the marriage, William Holden, and the Isbells subsequently had

---

[1] Although Marie Isbell survived her husband, she died during the pendency of the litigation.

their own child, Virginia Cloud. For the majority of their lives, the Isbells worked as farmers, slowly acquiring several acres of farm land. Although Marion never adopted his wife's son, Holden worked with his stepfather on the family farm for many years and leased farmland from the Isbells.

In early 2000, Holden assisted Marion in building a reservoir on a portion of the Isbell property. Holden asked his mother how much he would receive for his efforts. She discussed the matter with Marion, and they decided to give each of the children $20,000. When Marion first offered Holden his portion of the money, Holden refused to accept the offer because he did not want to lose the money in his pending divorce action. Cloud, however, received her $20,000.

That same year, several disputes arose among the family members. Cloud and her husband, Harold Dean, filed a civil action against Holden over a boundary dispute, and Marion testified on behalf of his daughter in that case. Holden then placed a junk heap on the Isbells' property. Marion asked Holden to remove the junk, but his request went unheeded. Marion also accused Holden of stealing items from his farm.

In August 2000, the Isbells sold their farmland in two sales. The first was for the amount of $252,172.18, and the second included cash proceeds of $68,716.04 and a promissory note in the principal sum of $138,393.60 payable over five (5) years to Marion and Marie Isbell. Marion deposited the proceeds into a joint checking account held in both his and his wife's names. He later opened a separate checking account in his name funded with money from the joint account.

Over the next few months, Marion removed money from his checking account and purchased CDs in his name, totaling over $200,000. Marion had a will, executed in 1997, in which he bequeathed all of his property to his wife and then after her death to Cloud and Holden equally. However, in November 2002, Marion executed a new will with Cloud named as the executor. In that will, he created the Marion Isbell Family Trust into which all of his property would be placed. As the primary beneficiary, Marie would receive income from the trust for her care and support, and upon her death, Cloud, who was also the trustee, was to be the residual beneficiary.

Marion died on March 1, 2002, and his will was proffered for probate shortly thereafter. On April 11, 2002, Marie filed a pleading entitled Contest of Will or in the Alternative Election of

Surviving Spouse. At the same time, Holden filed a claim for $20,000 against Marion's estate for work done on the Isbell farm. On October 7, 2002, the circuit court entered an order granting Marie's request to exercise her right to take the surviving spouse's statutory share as against the will, but the court reserved its ruling on the will-contest issue.

On February 2, 2004, Cloud filed a motion for summary judgment, claiming that Marie's will contest was moot because she had taken against the will, and, therefore, the issue of whether the will was valid had no effect on the amount she would receive from the estate. After a hearing, the circuit court ruled in favor of Cloud, finding that the will contest was moot.

Meanwhile, on February 20, 2004, Marie filed an amended pleading in which she requested a declaratory judgment that the CDs purchased by her husband with the proceeds of the land sale were her property as the surviving tenant of a tenancy by the entirety in the joint funds. On August 28, 2005, she filed a motion for partial summary judgment, alleging that the CDs were her property by operation of law. A hearing was held on the motion, and Terry Northcutt, the accountant for the estate, testified that five of the CDs in question were traceable to the Isbell's joint account. On July 5, 2006, the circuit court entered an order in which it concluded that Marie owned the CDs by operation of law. The court found that Marion untruthfully told Marie that he had placed the land-sale proceeds in a trust for her benefit with the remaining proceeds to go to Cloud and Holden equally. The court then interpreted *Lofton v. Lofton, supra,* and *McEntire v. Estate of McEntire,* 267 Ark. 169, 590 S.W.2d 241 (1979), as standing for the proposition that a spouse cannot destroy an estate by the entirety in a joint bank account without the consent of the other spouse. Because Marion had not received his wife's consent to destroy the tenancy by the entirety by withdrawing the joint funds and purchasing the CDs, the circuit court found that an estate by the entireties existed in the CDs, which could be traced to funds from the joint account. Accordingly, the circuit court concluded that, as the surviving tenant by the entirety, Marie owned the CDs by operation of law.

With regard to other personal property, however, the circuit court declined to conclude that an estate by the entirety was created in that property because there was no evidence indicating that the property was held in the names of both spouses or originated from property held in both their names. The circuit

court also denied Holden's $20,000 claim, ruling that his claim against Marion's estate was really an attempt to collect upon an undelivered inter vivos gift from the decedent, Marion Isbell.

*Direct Appeal*

Cloud alleges two points of error on direct appeal. First, she asserts that Marie's declaratory-judgment action was time barred under the nonclaim provision of the Arkansas Probate Code, Ark. Code Ann. § 28-50-101 (Repl. 2004). Under that section, claims against an estate must be filed within three (3) months of the date of the first publication of the notice to creditors. Ark. Code Ann. § 28-50-101(a)(1). Cloud asserts that although Marie's original pleadings were filed in a timely manner, those actions were not claims against the estate. According to Cloud, however, Marie's declaratory-judgment action was a claim against the estate that was filed almost two years after the first publication of notice to creditors.

Despite Cloud's arguments before this court, after a review of the record, we cannot find any instance in which her argument on this point was made before the circuit court. According to our longstanding principle, we will not consider arguments made for the first time on appeal. *See McLane S., Inc. v. Davis*, 366 Ark. 164, 233 S.W.3d 674 (2006). Thus, we must decline to address Cloud's first point on appeal.

For her second point of error on direct appeal, Cloud contends that the circuit court erroneously relied on the *Lofton* decision in concluding that Marion could not destroy the tenancy by the entirety in the couple's joint funds without his wife's consent. Cloud points out that despite the appellate court's conclusions in *Lofton*, our court has never held that one spouse cannot destroy a tenancy by the entirety in a joint bank account without the other spouse's consent. For that reason, Cloud urges this court to overrule *Lofton*. Brandt, on the other hand, suggests that the *Lofton* case is not determinative of the matter at issue here because the theory that one spouse cannot unilaterally destroy a tenancy by the entirety in personal property has been firmly established by this court in other cases. We agree with Cloud that the circuit court's reliance on *Lofton* was misplaced, and therefore we reverse and remand.

When a husband and wife acquire property in both of their names, a presumption arises that a tenancy by the entirety in the property results. *See Ramsey v. Ramsey*, 259 Ark. 16, 531 S.W.2d 28

(1975). We have long recognized that a tenancy by the entirety can exist in personal property, as well as real property. *See Union & Mercantile Trust Co. v. Hudson*, 147 Ark. 7, 227 S.W. 1 (1921).

Over eighty years ago, in *Dickson v. Jonesboro Trust Co.*, 154 Ark. 155, 242 S.W. 57 (1922), this court first addressed the question of whether a spouse could destroy a tenancy by the entirety in jointly held funds by withdrawing those funds from the joint account. In that case, the decedent withdrew funds from an account jointly held by him and his wife, and, using those funds, the decedent issued two notes payable to the decedent alone and purchased liberty bonds and thrift stamps payable to bearer and negotiable upon delivery. *Id.* Our court held that by withdrawing funds from the account and reducing those funds to his separate possession, the decedent destroyed the tenancy by the entirety in those funds, but the estate by the entirety continued in the remaining balance of the joint account. *Id.* That holding was reiterated in *Black v. Black*, 199 Ark. 609, 135 S.W.2d 837 (1940), a case involving the issue of whether the decedent's widow owned the cash balance in a checking account held in the name of the decedent and his wife.

This court's rationale with regard to tenancies by the entirety in bank accounts was further clarified in *McEntire v. Estate of McEntire*, 267 Ark. 169, 590 S.W.2d 241 (1979). In that case, the decedent maintained a checking account in the name of himself and his wife, but prior to his death, the decedent removed his wife's name from the account. *Id.* We held that the widow was not entitled to the funds because the decedent had effectively destroyed the tenancy by the entirety when he withdrew his wife's authority to draw on the account, and he did not need to actually remove the funds in order to do so. *Id.* In so holding, the court explained that

> [a]n estate by the entireties in a bank account differs in one significant aspect from such an estate in real property in that the estate exists in the account only until one of the tenants withdraws such funds or dies leaving a balance in the account. Funds withdrawn or otherwise diverted from the account by one of the tenants and reduced to that tenant's separate possession ceases to be a part of the estate by the entireties. This does not mean that in a proper case under timely allegations of fraud or other such remedy, that one of the cotenants could not sustain an action to recover all or a part of the funds diverted or withdrawn by the other.

*Id.* at 175, 590 S.W.2d at 244-45; *see McGuire v. Benton State Bank,* 232 Ark. 1008, 342 S.W.2d 77 (1961).

As detailed above, our case law involving decedents' estates has never required one spouse to obtain the other's consent before destroying a tenancy in jointly held funds. Nor have our cases established that a surviving spouse is entitled to funds that the deceased spouse unilaterally diverted from a joint account. Instead, the cases have indicated that one spouse can reduce the amount of a tenancy by the entirety by withdrawing funds from a joint account and reducing them to his or her separate possession and, absent another claim for relief, the surviving spouse is only entitled to the remaining balance in the joint account.

Cases involving the distribution of marital property upon divorce, such as *Lofton v. Lofton,* 23 Ark. App. 203, 745 S.W.2d 635 (1988), have held otherwise. In *Lofton,* the Arkansas Court of Appeals considered the question of whether a husband who placed his inheritance into a joint checking account and then into CDs in his and his wife's names intended to make a gift of the inherited funds to his wife so as to convert the separate inheritance property to marital property. *Id.* The crux of that case was whether the husband had presented sufficient evidence of his intent to retain his inheritance as separate property and, thereby, rebut the presumption that the husband intended to make a gift of inherited funds to his wife. *Id.* While the court of appeals intimated that consent of one spouse is required for the destruction of a tenancy in joint funds, the court relied on that proposition solely for the purpose of determining the husband's intent. *Id.*

While the intent of a spouse in withdrawing joint funds, and the corresponding consent to withdrawal, might be significant in determining whether a spouse intended for the funds to remain marital property, evidence of a spouse's consent is not a requirement for purposes of the distribution of property under probate law. Knowing the intent of a spouse could aid a court in determining what was marital property and how that property should be equitably distributed in a divorce action. *See McGuire v. Benton State Bank, supra.* However, we have clearly stated that the law regarding marital property does not apply in situations other than divorce, including the settlement of estates. *Ellis v. Ellis,* 315 Ark. 475, 868 S.W.2d 83 (1994). In *Ellis* we stated "while the distributive share under probate law may not vary, the same cannot be said of the law of divorce, as the statute specifically empowers

the chancellor to alter the distribution of marital property as the equities dictate." *Id.* at 477, 868 S.W.2d at 84. Thus, we conclude that the circuit court erred in its application of *Lofton* to the instant case.

■ Because we have never required one spouse to obtain the other spouse's consent in order to reduce a tenancy by the entirety in joint funds, Marion was not precluded from unilaterally destroying the tenancy by the entirety in the joint checking account without Marie's consent.[2] As the surviving tenant by the entirety, Marie was only entitled, as a matter of law, to the balance of funds in the joint account at the time of her husband's death. Accordingly, we reverse and remand.

### Cross Appeals

Brandt and Holden bring separate cross appeals. Brandt asserts that the circuit court erred in not finding that all of the personal property claimed by Marion's estate was held by the Isbells as tenants by the entirety. Holden argues that the circuit court clearly erred in denying his $20,000 claim against the estate. This court reviews decisions of the probate court de novo on the record, but we will not reverse the decision of the circuit court unless it is clearly erroneous. *Bullock v. Barnes*, 366 Ark. 444, 236 S.W.3d 498 (2006).

Brandt claims that the circuit court erred in failing to conclude that all of the personal property in the estate's inventory was held by Marion and Marie as tenants by the entirety. According to Brandt, all of the property was purchased with marital funds from the joint checking account. Because the CDs and the tangible personal property originated from the same source, Brandt contends the circuit court should have deemed all the personal property to be Marie's as a matter of law. The circuit court concluded that the property was not held by the entirety because no evidence was produced to show that the property was held in the names of both Marion and his wife Marie.

■ As stated above, a presumption arises that a tenancy by the entirety is created when a husband and wife acquire property in both of their names. *See Ramsey v. Ramsey, supra.* Here, however,

---

[2] We note that Marie's pleadings did not contain any allegations of fraud, and the circuit court declined to attribute fraudulent intent to Marion.

no evidence was presented that any of the personal property claimed by the estate was held in both spouse's names. In fact, the record reveals that certain items of property, such as two vehicles and several stock certificates, were actually titled or issued in Marion's name alone. Due to the lack of evidence to refute the lower court's conclusion and because of our broad deference to the probate court on questions of fact, we cannot say that the circuit court clearly erred. Therefore, we affirm on this point.

In his cross appeal, Holden argues that the circuit court erred in denying his claim against the estate because Marion contemplated paying Holden $20,000 for his work on the reservoir. The circuit court determined that Holden was simply trying to obtain an inter vivos gift that was never delivered. We affirm the circuit court's ruling.

Very little proof was introduced to support Holden's position that he was a creditor of the estate. The circuit court examined Marion's deposition testimony given during the boundary-dispute litigation in which he stated that he never owed Holden $20,000 for his work. Marion testified that Holden asked if he would receive anything for his efforts, and Marie convinced her husband to give Holden $20,000. The couple also decided that they would give Cloud $20,000 to keep the siblings "even." While Holden did submit estimates prepared prior to the construction of the reservoir, labor costs were not included in the final total. The evidence Holden presented was anything but conclusive as to whether Marion intended the $20,000 as payment for Holden's work or as a gift. Thus, we cannot conclude that the circuit court clearly erred.

Reversed and remanded on Direct Appeal, Affirmed on Cross Appeal.